IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PSC INDUSTRIES, INC.,             )
                                  )
       Plaintiff,            )
                                  )     NO. 3:19-cv-00362
v.                           )     JUDGE RICHARDSON
                                  )
DAVID E. JOHNSON,         )
                                  )
       Defendant.       )

## MEMORANDUM OPINION

Pending before the Court are two motions. Defendant has filed a motion for summary judgment. (Doc. No. 31, "Defendant's Motion"). Plaintiff responded. (Doc. No. 52, "Plaintiff's Primary Brief"). Defendant replied. (Doc. No. 63, "Defendant's Reply"). In addition, Plaintiff filed a cross-motion for partial summary judgment (Doc. No. 51, "Plaintiff's Motion"), supported by arguments in Plaintiff's Primary Brief.[1] Defendant responded to Plaintiff's Motion. (Doc. No. 68). Plaintiff replied. (Doc. No. 74). Both Motions are ripe for review.

For the reasons discussed herein, both Motions will be granted in part and denied in part.

---

[1] Defendant moved to strike the cross-motion on the grounds that Plaintiff did not ask for leave of the Court to file a partial motion. (Doc. No. 59). Thereafter, Plaintiff belatedly filed a motion for leave to file a cross-motion for partial summary judgment. (Doc. No. 60). The Court denied Defendant's motion to strike and granted Plaintiff's motion for leave to file a partial motion for summary judgment. (Doc. No. 65).

1

## FACTUAL BACKGROUND[2]

Plaintiff produces parts that are used by automobile manufacturers. (Doc. No. 69 at ¶ 1). Its business is awarded through competitive bidding of contracts, for which only qualified bidders can submit a bid. (*Id.* at ¶ 2). For each prospective job on which it bid, Plaintiff would provide a custom quote. (*Id.* at ¶ 5). Defendant disputes the exclusivity of this process, as sometimes an unqualified bidder can prevail by bidding multiple times. (*Id.*). Regardless of the nuances of the process, it seems undisputed that having the status of a "qualified" (as opposed to unqualified) bidder provides advantages in making successful bids in Plaintiff's industry. Plaintiff further

---

[2] The facts in this section are taken from Plaintiff's Response to Defendant's Statement of Undisputed Facts (Doc. No. 54), Defendant's Reply to Plaintiff's Additional Facts (Doc. No. 64), and Defendant's Response to Plaintiff's Statement of Undisputed Facts made in connection with Plaintiff's Motion (Doc. No. 69).

Unless indicated otherwise (as for example by where certain facts are identified as being merely asserted by a party or otherwise qualified in some manner), the facts set forth in this section are undisputed. Thus, the facts set forth here are either undisputed or specifically identified as disputed. In stating the facts herein, the Court often uses the language used by the party who provided the facts; this helps the Court ensure that the facts as stated herein are undisputed, even if the language used is less precise or thorough than the Court would have used were it writing on a blank slate.

The Court notes that in responses to the various statements of fact, many objections were made that particular asserted facts were irrelevant or legal conclusions. The Court has not referred herein to the facts that it believes to be irrelevant or legal conclusions and will not consider them in ruling on these Motions. *E.g.*, *Equitesa Equipos y Terrenos, SA v. Valley Enterprises of Ohio, LLC*, No. 1:10-CV-01555, 2011 WL 5374127, at *5 (N.D. Ohio Nov. 3, 2011) ("[L]egal conclusions . . . do not suffice to create a genuine issue of material fact for trial."). To the extent the Court relies on facts that were disputed as being irrelevant or legal conclusions, the Court does not believe the objection to be warranted or has noted herein its reasons for considering the fact despite the objection.

defines its sales work as a "relationship business," where knowing whom to talk to could be the key for having business with a particular customer.[3] (*Id.* at ¶ 4).

It is undisputed that Plaintiff would contractually obligate itself to maintain the confidentiality of its customers' information. (*Id.* at ¶ 6). Defendant disputes that certain information, such as buyer contacts, shipping, supply chain, or third-party information, was within the scope of these confidentiality agreements. (*Id.*). Specifically, Plaintiff claims that at all times during which it was a qualified bidder for its customer Inergy (a.k.a Plastic Omnium), it was contractually obligated to maintain the utmost confidence of Inergy's business information. (*Id.* at ¶ 7). Defendant disputes this, arguing that the confidentiality agreements started in October 2016 and did not necessarily encompass all of Inergy's business information. (*Id.*). Plaintiff further claims that its bids for customer work were confidential business records, but Defendant claims that not all bids for customer work were confidential business records and that outdated, stale bids no longer retained value or confidentiality. (*Id.* at ¶ 8). Plaintiff believes that maintaining the confidentiality of the contacts it developed, its customer's business information, its key customer contacts, and its own competitive bids gives Plaintiff an advantage in the industry. (*Id.* at ¶ 9). Defendant disputes this, claiming that key customer contacts are widely known and readily available and that quotes and prices are often widely known and discussed to streamline the bidding process and promote competition. (*Id.*).

Plaintiff also claims that it obligates its employees not to disclose Plaintiff's business records or Plaintiff's customer information, but Defendant disputes that any confidentiality

---

[3] Defendant contests, claiming this to be a smaller part of the sales work than Plaintiff claims it is. Regardless of how much of the sales work comprises relationships and relationship building, it seems undisputed that this makes up a decent portion of Plaintiff's sales business.

3

obligation extended to Plaintiff's customer information or records that are routinely disclosed to third parties. (*Id.* at ¶ 13). Defendant's access to some business and customer business information undisputedly was by virtue of his employment, but the parties disagree as to which information is considered confidential. (*Id.* at ¶ 12).

Defendant signed an Employee Agreement and an Employee Handbook (which was updated from time to time). (*Id.* at ¶ 14). The Employee Agreement provided that:

> Employee agrees that he will devote his time, skill, knowledge, and best efforts during the period of his employment to such duties as may be reasonably assigned to him, and he will faithfully and diligently endeavor to further the best interests of Company during the period of said employment . . .

> Employee agrees that he will not at any time, either during or subsequent to his employment, disclose to others, or use, except for the Company, its successors, assigns or nominee, any secret, confidential or proprietary information or know-how of the Company (whether or not developed by the Employee) without the Company's prior written consent. The term "secret, confidential or proprietary information and know-how of the Company" shall include, but shall not be limited to, the Company's plans, customers, costs, prices, uses and applications of products, results of investigations or experiments, and all apparatus, products, processes, compositions, samples, formulas, computer programs and manufacturing methods at any time used developed, investigated, made or sold by the Company, before or during the Employee's tenure of employment.

(Doc. No. 33-5 at 2).[4] The Employee Handbook additionally provides that:

> Employees must respect the private or proprietary information they acquire in the course of their work and not misuse, discuss or disclose any such information to unauthorized persons. This private and proprietary information includes know-how, formulas, designs, plans, ideas, cost and expense data, production data, financial statements, marketing and customer data, technologies, specifications, techniques, processes, trade secrets, or any other information that is not generally available from published information or public or trade sources, as well as information obtained from working in PSC Industries' Inc.'s plants or offices. Employees must not misuse Company information, property, or services for personal gain. The unauthorized removal of Company materials, records, supplies or equipment is prohibited.

---

[4] The Court notes that many of the documents in this case were filed, and remain, under seal. The sealing shall be deemed lifted by virtue of this memorandum opinion only to the extent that particular information therein has been referred to herein.

4

(Doc. No. 33-6 at 46). The Employee Handbook also lists rules of conduct, which include prohibitions of dishonesty; falsification of company records or forms; misuse or removal of company property, employee lists, records, or confidential information; and obtaining money from the company by fraudulent orders or misrepresentations. (*Id.* at 47-49).

Defendant was employed by Plaintiff for approximately 45 years. (Doc. No. 54 at ¶ 1). Defendant was an at-will employee of Plaintiff. (*Id.* at ¶ 43). Defendant regularly traveled to Mexico on business for Plaintiff. (*Id.* at ¶ 3). Plaintiff accuses Defendant of improperly aiding Gary Young, Defendant's former boss at PSC, with a new company called VFM, LLC ("VFM"). (*Id.* at ¶ 8). Defendant claims that discovery has not shown that he was working on behalf of VFM. (*Id.* at ¶ 10). Plaintiff disputes this, stating that Defendant has admitted that he obtained Plaintiff's proprietary information on behalf of VFM and conveyed that information to Young, VFM's president. (*Id.*). Plaintiff also claims that Young's request for the PSC information was linked to Young's efforts to build VFM's sales. (*Id.*).

Many of the facts regarding VFM and its formation are disputed. Plaintiff and Defendant dispute whether Plaintiff's management was aware that Young was involved in another business (VFM) by 2011 while Young was still employed by Plaintiff. (*Id.* at ¶ 14). Plaintiff and Defendant dispute whether PSC president Damien Osbourne informed PSC owners in 2014 that Young was involved with VFM. (*Id.* at ¶ 15). Defendant states that he knew that VFM provided services that Plaintiff did not provide (molding, distribution, and flame lamination), and so he believed VFM did not compete with Plaintiff. (*Id.* at ¶ 16). Plaintiff disputes this, stating that Defendant's actions, such as concealing his whereabouts during trips to Mexico and emailing PSC company information to his private email address before forwarding it to VFM, show that he knew VFM would be regarded as a competitor by Plaintiff. (*Id.*).

5

Plaintiff claims that Defendant's expense reports routinely misrepresented that he was in certain areas of Mexico on PSC business, when in fact he was in Queretaro, Mexico with the president of VFM. (Doc. No. 64 at ¶ 1).[5] Defendant's expense reports concededly contained small errors throughout the years, but he objects to the use of the expense reports (which do not show whom he spent time with) to establish that he was misrepresenting his location and was actually spending time with the president of VFM. (*Id.*). Defendant says that he did not meet with any VFM customers or clients while travelling to Mexico, but Defendant undisputedly visited the site of a VFM facility with Young (the VFM president) while in Mexico.[6] (Doc. No. 54 at ¶ 20). Defendant would submit complete versions of his receipts for time he spent near Plaintiff's facilities and customers in Mexico. (Doc. No. 64 at ¶ 2). Plaintiff claims that Defendant would then submit obscured or incomplete receipts for his time in Queretaro with the president of VFM. (*Id.*). Defendant argues that the photocopies are simply not clear and of poor quality, disputing that the receipts were somehow intentionally incomplete or obscured. (*Id.*). Defendant claims that each of his expense reports and reimbursement requests were for legitimate PSC business, but Plaintiff claims that they were not, referencing Defendant's trips to Queretaro which occurred a great distance from his PSC business. (Doc. No. 54 at ¶ 21). Defendant also states that his expense reports for his trips to Mexico were approved by several mangers, but Plaintiff responds that they were primarily approved by Young and that any other supervisor reviewing the expense report would have relied on Young's determination. (*Id.* at ¶ 19).

---

[5] Plaintiff provided the Court with a chart documenting the exact misrepresentations which the Court has included later in this Opinion. (Doc. No. 52 at 21-22).

[6] Defendant included this information on his errata sheet correcting his deposition. (Doc. No. 55-11 at 5).

Also at issue in this case are several forwarded emails sent from Defendant to Young after Young had left his employment with Plaintiff. (Doc. No. 43). Most of these forwarded emails contained customer contact information and client information. (*Id.*). Additionally, in one email, Defendant forwarded product specifications from Inergy for a rubber isolator part and Plaintiff's price quote to make the part. (Doc. No. 69 at ¶ 21). Defendant had worked with Inergy for around three years while it was a customer of Plaintiff. (*Id.* at ¶ 22). Defendant had forwarded the information from his work email to his personal email before sending it to Young. (*Id.* at ¶ 24). Plaintiff believes that Young had requested this information. (*Id.* at ¶ 23). Defendant agrees that Young requested information for Inergy and Halyard, after a contact at Inergy indicated an interest in purchasing molded rubber parts (which Plaintiff did not supply). (*Id.*). Undisputedly, this was the content of the emails and Plaintiff had lost the bid for the rubber isolator part while Young was still an employee. (Doc. No. 54 at ¶¶ 26, 27).

The Amended Complaint[7] asserts numerous counts: 1) breach of contract, 2) breach of fiduciary duty, 3) interference with business relationships, 4) fraudulent concealment, 5) fraudulent misrepresentation, 6) conversion, 7) unjust enrichment, and 8) misappropriation of trade secrets under the Tennessee Uniform Trade Secrets Act ("TUTSA") and the federal Defend Trade Secrets Act ("DTSA").[8]

---

[7] The Amended Complaint is the operative complaint in this matter. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000).

[8] Defendant makes much of the fact that Plaintiff has apparently filed other lawsuits (against Young, Defendant, and another employee) in other courts. (Doc. No. 32). The existence of other lawsuits does not support the merits of Defendant's Motion, and the Court will disregard the implications Defendant draws from the existence of these other lawsuits.

7

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary

8

judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at **5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

## DISCUSSION

Defendant's Motion argues that Defendant is entitled to summary judgment on each of the eight counts in the Amended Complaint and that this Court lacks subject-matter jurisdiction. (Doc. No. 32). Plaintiff's Motion seeks summary judgment only on its claims for (1) breach of contract, and (2) misappropriation of trade secrets. (Doc. No. 51). On those claims, Plaintiff seeks only a

liability determination, with damages to be determined later if Defendant is found liable.[9] (*Id.*). The Court will first discuss subject-matter jurisdiction before discussing each claim in the Amended Complaint in turn.

As a preliminary matter, Plaintiff concedes that its claims for breach of fiduciary duty, fraudulent concealment, and other torts do not seek liability on the basis of Defendant's disclosure of business records, and it concedes that these claims are preempted by TUTSA. (Doc. No. 52 at 28). However, despite Defendant's argument to the contrary, Plaintiff's breach of contract claim

---

[9] In granting Plaintiff permission to file a motion for partial summary judgment, the Court found it appropriate to consider Plaintiff's Motion (with respect to those claims implicated by such motion) as to liability only. (Doc. No. 65 at 3-4 (collecting cases)); *see also Sunteck Transp. Co. v. Baxter Bailey & Assocs., Inc.*, No. 3:13-CV-00271, 2014 WL 12642571, at *4 (M.D. Tenn. Sept. 15, 2014) ("To be entitled to summary judgment on the issue of liability, Plaintiff need not prove the amount of damages, but merely that Defendant committed a legal wrong by violating the agreement that resulted in an injury to Plaintiff."); *Gay & Taylor, Inc. v. Am. Cas. Co. of Reading, Pa.*, 53 Tenn. App. 120, 128, 381 S.W.2d 304, 307 (1963) ("Upon breach of a valid and binding contract, the law infers some damages, and generally the person guilty of the breach is liable at least for nominal damages, if actual damages cannot be proved.") (quoting *Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Pub. Co.*, 42 Tenn. App. 92, 105, 298 S.W.2d 788, 795 (1956)); *Amtax Holdings 285, LLC v. Oppurtunity Builders, Inc.*, No. 07-CV-1191, 2009 WL 331419, at *7 (W.D. Tenn. Feb. 9, 2009) ("Rule 56(d)(2) permits that '[a]n interlocutory summary judgement may be rendered on liability alone, even if there is a genuine issue on the amount of damages.' Fed. R. Civ. P. 56(d)(2). As such, the Court grants AMTAX's motion for summary judgment on its breach of contract claim, but not on the calculation of damages."). The Court noted in so ruling that "[t]he Court is aware that in assessing whether to grant summary judgment as to liability on Counts I and VIII as requested in the MSJ motion, it must hold Plaintiff to any applicable burden of showing the absence of a genuine issue of material fact as to the existence of damages (injury), even though it need not yet address whether there is a genuine issue as to the amount of damages." (Doc. No. 65 at 4). Defendant argues in his Response to Plaintiff's Motion that "[t]he granting of a partial summary judgment would place the Defendant in an untenable and highly prejudicial position of potentially defending unrelated claims based on conduct for which liability had been Court established, and could create further unnecessary litigation." (Doc. No. 68 at 14). The Court does not find this to be the case, as Plaintiff is preempted from using the emails as factual support for the claims not within the scope of Plaintiff's Motion. *See J.T. Shannon Lumber Co. v. Barrett*, No. 2:07-CV-2847-JPM-CGC, 2010 WL 3069818, at *11 (W.D. Tenn. Aug. 4, 2010) ("Plaintiff's breach of fiduciary duty claim may survive TUTSA preemption if it is supported by facts distinct from those supporting its trade secret misappropriation claim.").

is not preempted by TUTSA or DTSA. T.C.A. § 47-25-1708; *Vincit Enterprises, Inc. v. Zimmerman*, No. 1:06-CV-57, 2006 WL 1319515, at *7 (E.D. Tenn. May 12, 2006) ("TUTSA does not affect, *inter alia*, contractual remedies or civil remedies not based on misappropriation of a trade secret."). Therefore, the Court will consider the emails that allegedly contain trade secrets and confidential business records only when discussing the breach of contract claim and misappropriation of trade secrets claim, and not when analyzing Plaintiff's other claims.

The parties do not dispute that Tennessee law applies to the matter at hand.

1. <u>Subject Matter Jurisdiction</u>

Defendant attacks this Court's subject-matter jurisdiction on the grounds that the amount in controversy (allegedly) is not sufficient and that Plaintiff has not properly alleged federal-question jurisdiction. (Doc. No. 32 at 7-8). Plaintiff argues that this Court has subject matter jurisdiction. (Doc. No. 52 at 8-9).

"A district court has subject-matter jurisdiction where the complaint (1) raises a federal question, or (2) where the parties have diversity of citizenship and the amount in controversy exceeds $75,000." *Wilson v. Allstate Ins. Co.*, No. 17-4248, 2018 WL 6422853, at *1 (6th Cir. June 25, 2018) (citing 28 U.S.C. §§ 1331, 1332).

Regarding diversity jurisdiction, federal district courts have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. 28 U.S.C. § 1332(a). The parties do not dispute that there is diversity of citizenship here, but instead dispute whether the amount in controversy requirement is met. In determining whether Section 1332's "amount in controversy" requirement is met, federal courts look to the amount alleged in the complaint. *Mitan v. Int'l Fidelity Ins. Co.*, 23 F. App'x 292, 297 (6th Cir. 2001). "A district court should consider the

11

amount alleged in a complaint and should not dismiss a complaint for lack of subject matter jurisdiction 'unless it appears to a legal certainty that the plaintiff in good faith cannot claim the jurisdictional amount.'" *Massachusetts Cas. Ins. Co. v. Harmon*, 88 F.3d 415, 416 (6th Cir. 1996) (quoting *Klepper v. First Am. Bank*, 916 F.2d 337, 340 (6th Cir. 1990)); *see also St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938); *Kovacs v. Chesley*, 406 F.3d 393, 395 (6th Cir. 2005). "It is well established that claims can be aggregated to satisfy the jurisdictional amount requirement." *Klepper*, 916 F.2d at 341. As the party invoking jurisdiction, the plaintiff carries the burden of showing that a court has jurisdiction. *St. Paul Mercury Indem. Co.*, 303 U.S. 283, 289 n.10. However, few situations disqualify an amount in controversy as being too low:

> Generally speaking, the legal certainty test makes it very difficult to secure a dismissal of a case on the ground that it does not appear to satisfy the jurisdictional amount requirement. Only three situations clearly meet the legal certainty standard: 1) when the terms of a contract limit the plaintiff's possible recovery; 2) when a specific rule of law or measure of damages limits the amount of damages recoverable; and 3) when independent facts show that the amount of damages was claimed merely to obtain federal court jurisdiction.

*Pachinger v. MGM Grand Hotel-Las Vegas, Inc.*, 802 F.2d 362, 364 (9th Cir. 1986) (quoting 14A Wright, Miller, and Cooper, Federal Practice and Procedure, Jurisdiction, § 3702 at 48–50 (2d ed. 1985)).

Defendant's arguments that the amount in controversy is not met ignore the relevant legal impossibility standard. Defendant instead focuses his arguments on whether Plaintiff is likely to recover, without arguing that Plaintiff cannot recover over $75,000 as a legal certainty. (Doc. No. 32 at 8). This argument is insufficient. *See Clair v. Zink*, No. 3:20-CV-0371, 2020 WL 7864301, at *7 (M.D. Tenn. Dec. 31, 2020) (Richardson, J.) (denying motion to dismiss when defendant argued the wrong standard in attempting to show that the complaint did not meet the amount-in-controversy requirement). Plaintiff has alleged in its Amended Complaint that the amount in

controversy exceeds $75,000 or more in damages. (Doc. No. 23 at 3). There does not appear to be any reason that it would be a legal impossibility for Plaintiff to recover more than $75,000. Additionally, Defendant's arguments appear to misread the expert's report, which indicates that Plaintiff's damages from its aggregated claims may well surpass $75,000.[10] (Doc. No. 44). Therefore, the Court finds that it has subject-matter jurisdiction over this matter due to diversity jurisdiction.

Alternatively, the Court would find that it has subject-matter jurisdiction over this matter because of federal-question jurisdiction. "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. So this Court has such jurisdiction (so-called "federal-question" jurisdiction) over this action to the extent it can be said to arise under laws of the United States. The Court's "review of whether federal-question jurisdiction exists is governed by the well-pleaded complaint rule, which provides that jurisdiction exists only when a federal question is presented on the face of the plaintiff's complaint." *Kitzmann v. Local 619-M Graphic Commuc'ns Conference of Int'l Bd. of Teamsters*, 415 F. App'x 714, 716 (6th Cir. 2011) (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)). Defendant claims that Plaintiff has never asserted federal question jurisdiction. (Doc. No. 63 at 1-2). Defendant is correct that in the Amended Complaint, Plaintiff invokes jurisdiction only

---

[10] For purposes of determining subject-matter jurisdiction, the Court finds that the expert report lends additional support to Plaintiff's alleged damages in the Amended Complaint by supporting the possibility that Plaintiff could recover over $75,000. Defendant claims that the royalty analysis is "convoluted" and "fictionalized." (Doc. No. 63 at 1-2). However, TUTSA specifically allows for recovery of royalties: "[i]n lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." Tenn. Code Ann. § 47-25-1704(a). The Court additionally notes that Defendant served no rebuttal expert report by the deadline to do so, and thus the Court has the benefit of examining only Plaintiff's expert report. (Doc. No. 74 at 3).

under 28 U.S.C. § 1391, which prescribes diversity jurisdiction, without ever mentioning federal question jurisdiction. (Doc. No. 23 at 3). However, Plaintiff has clearly pled a claim under a federal statute with its misappropriation of trade secret claim which arises under the federal statute DTSA. Though Plaintiff failed to specifically allege that it was also invoking federal question jurisdiction (in addition to diversity jurisdiction), the Court finds that "a federal question is presented on the face of the plaintiff's complaint" because of the inclusion of the DTSA claim. *See Kitzmann*, 415 F. App'x at 716. The Court therefore finds alternatively that it has federal-question jurisdiction over the DTSA claim and, moreover, supplemental jurisdiction over the pendent state law claims as Plaintiff argues. (Doc. No. 52 at 9).[11]

---

[11] The Sixth Circuit has explained when a district court should exercise supplemental jurisdiction as follows:

> The doctrine of supplemental jurisdiction, originally set forth in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), was codified by 28 U.S.C. § 1367. Section 1367 grants a district court broad discretion to decide whether to exercise jurisdiction over state-law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the "values of judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *accord Landefeld v. Marion Gen. Hosp., Inc.,* 994 F.2d 1178, 1182 (6th Cir.1993) (holding that a district court should consider several factors in deciding whether to exercise supplemental jurisdiction, including "the avoidance of multiplicity of litigation, and [that it should] balance those interests against needlessly deciding state law issues"). A district court may also "consider whether the plaintiff has engaged in any manipulative tactics when it decides whether to remand a case. If the plaintiff has attempted to manipulate the forum, the court should take this behavior into account" in determining whether the balance of factors supports a remand of the state-law claims. *Carnegie–Mellon,* 484 U.S. at 357, 108 S.Ct. 614.

*Gamel v. City of Cincinnati*, 625 F.3d 949, 951–52 (6th Cir. 2010). Since all of Plaintiff's claims relate to Defendant's employment with Plaintiff and his relationship with VFM, the Court would exercise its discretion to find that it has supplemental jurisdiction over the pendent state law claims.

Therefore, on each of two alternative bases, the Court finds that it has subject matter jurisdiction over this dispute and will turn to discussing the case on its merits.

2. <u>Misappropriation of trade secrets and breach of contract</u>[12]

Plaintiff and Defendant each have moved for summary judgment on these claims. The Court will discuss these claims in the same section, as each is premised on the emails sent by Defendant to Young while Young was working at VFM.

A. <u>Breach of Contract</u>

"To establish a [claim for] breach of contract, a plaintiff must show (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *Great Am. Opportunities, Inc. v. Cherry Bros., LLC*, No. 3:17-CV-01022, 2019 WL 632670, at *8 (M.D. Tenn. Feb. 14, 2019).

Plaintiff argues that "Johnson indisputably (i) owed a contractual obligation to keep [Plaintiff's] business records confidential to [Plaintiff], and (ii) breached that contractual obligation on at least four occasions by forwarding [Plaintiff's] business records to Gary Young, who worked for a different company [VFM] in the same industry as [Plaintiff]." (Doc. No. 52 at 16-17). Defendant argues that the Employee Agreement originally signed by Defendant was later superseded by the Employee Handbook. (Doc. No. 32 at 9-10). Then, Defendant proceeds to argue that the Employee Handbook is not a contract, and so he cannot be held to the terms therein. (*Id.* at 10). Therefore, in order to determine whether Defendant has breached a contractual obligation,

---

[12] The Court notes that "confidential information" is analogous to "trade secret," and the Court uses the terms interchangeably. *Fid. Brokerage Servs. LLC v. Clemens*, No. 2:13-CV-239, 2013 WL 5936671, at *8 (E.D. Tenn. Nov. 4, 2013).

the Court must determine whether a valid contract was in force and what comprised that contract (if one existed at all).

An employee handbook can constitute a contract between an employer and employee. This Court has explained that:

> For the handbook to be considered part of the employment contract, however, the specific language of the handbook must show contractual intent. *Davis v. Connecticut General Life Ins. Co.*, 743 F. Supp. 1273, 1279 (M.D. Tenn. 1990) (citing *Smith v. Morris*, 778 S.W.2d 857, 858 (Tenn. Ct. App. 1988)). Further, before the handbook will be considered part of the employment contract, the handbook must provide specific guarantees to the employees. *Id.* (citing *McDougal v. Sears, Roebuck & Co.*, 624 F. Supp. 756, 759 (E.D. Tenn. 1985)).

*AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 387 (M.D. Tenn. 1993); *see also Williams v. Maremont Corp.*, 776 S.W.2d 78, 80 (Tenn. Ct. App. 1988) (finding employee handbook to be a contract); *Hamby v. Genesco, Inc.*, 627 S.W.2d 373, 376 (Tenn. Ct. App. 1981) ("We are of the opinion that the Chancellor correctly held that the handbook was a part of the contract of employment between plaintiffs and [Defendant]."). However, if an Employee Handbook contains a unilateral reservation of a right to amend or lacks specific evidence of an intent to be bound, it is not a contract. *See e.g.*, *Logue v. Shelbyville Hous. Auth.*, No. M199902555COAR3CV, 2000 WL 122228, at *2 (Tenn. Ct. App. Feb. 1, 2000) ("An employee manual or handbook that creates a definite term or other employee benefit must contain specific language showing the employer's intent to be bound by the handbook's provisions. The reservation of a unilateral right to change the handbook contradicts an intent to be contractually bound by its provisions." (internal citations omitted)); *Woods v. Metro. Dev. & Hous. Auth. Bd. of Comm'rs*, 345 S.W.3d 903, 910 (Tenn. Ct. App. 2011) ("Furthermore, the reservation of a 'unilateral right' in favor of the Board to alter or amend the handbook contradicts an intent to be contractually bound by its provisions."); *Jeffries*

*v. U.S. Metal Powders, Inc.*, No. E2013-00521-COA-R3CV, 2014 WL 239179, at **5–6 (Tenn. Ct. App. Jan. 22, 2014) (collecting cases).

Plaintiff argues that the Employee Handbook is a contract because (according to Plaintiff) the Employee Handbook contains evidence of contractual intent and provides specific guaranties to the employee. (Doc. No. 52 at 18). The Court agrees that the Employee Handbook does provide many specific guaranties to the employee, such as religious accommodations, accrual of vacation benefits, paid sick leave, etc. (*Id.*). As evidence of contractual intent, Plaintiff points to the following language: "I understand that [the Handbook] supersedes and replaces any other understanding, practice, handbook, agreement, or representation concerning the topics discussed." (*Id.*). Plaintiff calls this statement a "clear manifestation of contractual intent." (*Id.*). However, Plaintiff does not explain *how* this language evidences a "clear manifestation of contractual intent."[13] In contrast with this purported statement of contractual intent, the Employee Handbook is unilaterally subject to change by Plaintiff at any time. Employees were required to sign an acknowledgement and agreement form attached to the Employee Handbook stating:

> Since the information, policies, and benefits described herein are necessarily subject to change, I acknowledge that revision to the handbook may occur—however, all such changes will be communicated only in writing, signed by an officer of PSC Industries, Inc. and will specifically reference this handbook. I understand that these revisions may supersede, modify or eliminate existing policies. I understand as well that no other actions, statements or practices of the Company will modify this handbook.

---

[13] As suggested below, Plaintiff could have made (and supported with case law) the argument that anything so effectual as to be able to supersede a contract must itself be a contract, and that therefore the Employee Handbook's express ability to supersede any "agreement" (which generally is synonymous with "contract") suggests an intention that it be a contract. But Plaintiff made no argument to this effect or provide any other explanation as to how the Employee Handbook manifested contractual intent.

(Doc. No. 33-6 at 54).[14] This statement prescribes no limitations on Plaintiff's ability to unilaterally change the Employee Handbook at any time, which indicates strongly that this is not a contract. *E.g.*, *Logue*, 2000 WL 122228, at *2. Because it is far from clear that the language Plaintiff highlights actually evidences contractual intent and because the Employee Handbook provides for unilateral changes, the Court does not find that the Employee Handbook constitutes a contract.

The other document Plaintiff deems a contract is the Employee Agreement. The Court finds that the Employee Agreement constitutes an enforceable contract. The document appears to reflect a valid offer, acceptance, and consideration (the benefits to each side associated with Defendant's employment with Plaintiff), and Defendant has made no argument that any of these elements are missing.[15] As previously noted, the Employee Agreement imposed many restrictions on Defendant's conduct as an employee:

---

[14] Defendant argues that this section, taken with another section indicating that this is an at-will employee relationship, expressly states that the Employee Handbook is not a contract. (Doc. No. 32 at 11-12). Despite Defendant's argument, the Court does not see anywhere that the Employee Handbook expressly states that it is or is not a contract. Additionally, the fact that the Employee Handbook maintains an at-will relationship does not preclude it from also being a contract. *AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 387 (M.D. Tenn. 1993) ("An employee handbook may form a part of the contractual relationship between an employer and employee, even in the case of employees-at-will, such as Crook and Jenkins.") (citing *Williams v. Maremont Corp.*, 776 S.W.2d 78, 80 (Tenn. Ct. App. 1988)). Therefore, the Court is not persuaded by Defendant's argument in this regard.

[15] Aside from a few vague statements criticizing the scope and terms of the document, Defendant's only argument that the Employee Agreement is not a contract is that the Employee Agreement was superseded or replaced by the Employee Handbook. (Doc. No. 32 at 9). As the Court has found that the Employee Handbook was not a contract, it cannot have superseded the Employee Agreement. As a more general note, the Court finds Defendant's argument logically inconsistent. As Plaintiff notes, a non-contract cannot supersede a contract. *Empiregas Inc. of Ardmore v. Hardy*, No. 86-44-II, 1987 WL 7012, at *2 (Tenn. Ct. App. Feb. 27, 1987) ("If the substituted contract is void, illegal or otherwise invalid, no substitution, merger or novation can take place whereby the earlier contract becomes unenforceable." (collecting cases)). The Court also agrees with Plaintiff that Defendant failed to raise novation, an affirmative defense, in its answer and thus cannot raise the issue for the first time in a motion for summary judgment. *See Staggs by Cocke v. Waddey*, No. S.C. 88-23-I, 1988 WL 123115, at *2 (Tenn. Nov. 21, 1988) ("Novation, which is

Employee agrees that he will devote his time, skill, knowledge, and best efforts during the period of his employment to such duties as may be reasonably assigned to him, and he will faithfully and diligently endeavor to further the best interests of Company during the period of said employment . . .

Employee agrees that he will not at any time, either during or subsequent to his employment, disclose to others, or use, except for the Company, its successors, assigns or nominee, any secret, confidential or proprietary information or know-how of the Company (whether or not developed by the Employee) without the Company's prior written consent. The term "secret, confidential or proprietary information and know-how of the Company" shall include, but shall not be limited to, the Company's plans, customers, costs, prices, uses and applications of products, results of investigations or experiments, and all apparatus, products, processes, compositions, samples, formulas, computer programs and manufacturing methods at any time used developed, investigated, made or sold by the Company, before or during the Employee's tenure of employment.

(Doc. No. 33-5 at 2). The Court will now turn to the content of the emails at issue to determine whether Defendant breached the Employee Agreement by sending the emails to Young, who had left PSC for VFM at the time the emails were sent. There are several emails at issue, which the Court summarizes as follows:

- <u>September 2016 email</u>: This email contained a contact for a client, the Kasai Group. (Doc. No. 43 at 3). It had an attachment with technical specifications for client Inergy regarding a rubber component. (*Id.* at 4-13). This document also contained PSC's quotation for the Inergy work from 2014. (*Id.* at 14).

- <u>First July 7, 2017 email</u>: This email forwarded an email chain including two contacts at Plaintiff's client Halyard, as well as information on a conversation regarding a quote for a project involving foam reduction. (*Id.* at 17-24).

- <u>Second July 7, 2017 email</u>: This email contained information about the departure, from client Inergy, of a contact and about who the new contact at Inergy would be. (*Id.* at 25).

- <u>First July 18, 2017 email</u>: This email contained contact information for an individual at Inergy, as well as information on a particular purchase order. (*Id.* at 25-29).

- <u>Second July 18, 2017 email</u>: This email contained the same contact information provided in the Second July 7, 2017 email. (*Id.* at 30).

---

an affirmative defense, was not specially pled."). Defendant has made no other argument that the contract is not enforceable under Tennessee law or was not a valid contract.

19

The types of information that Defendant was not allowed to disclose without prior written consent under the Employee Agreement included "customers," "prices," and "processes" of Plaintiff. As indicated above, the emails undisputedly contained customer contact information, the quotes that Plaintiff gave on two different projects, and general information regarding the processes of the client relationships, bids, and ordering processes.[16] These disclosures are specifically treated in the Employee Agreement as information that Defendant could not disclose without prior written consent of Plaintiff. Each of these emails therefore effected breach of the Employee Agreement.[17]

Therefore, the Court will grant summary judgment to Plaintiff on its breach of contract claim (Count I) as to liability only.

B. TUTSA/DTSA

Plaintiff has brought its claim for misappropriation of trade secrets under both TUTSA and DTSA. The respective requirements for establishing misappropriation under these statutes are largely the same, and so the Court will conduct a single analysis. *See Great Am. Opportunities,*

---

[16] Defendant makes an argument that this information was not Plaintiff's but rather that of a third party, and so Plaintiff has no valid cause of action for breach. (Doc. No. 68 at 13). However, the Employee Agreement did not acknowledge or give any effect to this distinction; moreover, it specifically included within its scope information, such as "customers" (apparently meaning customer identity and contact information), that would be known to third parties to some extent. Thus, contrary to Defendant's argument, the Employee Agreement could be (and was) breached irrespective of whether the information Defendant disclosed is properly considered information of a third party.

[17] Defendant additionally argues that there was no breach of contract because Plaintiff was not damaged. (Doc. No. 63 at 3). As previously noted, Plaintiff has not moved for summary judgment as to damages. The Court is not persuaded by Defendant's argument that Plaintiff was not damaged, as Plaintiff can recover nominal damages in Tennessee for breach of contract. *Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Pub. Co.*, 42 Tenn. App. 92, 105, 298 S.W.2d 788, 795 (1956) (collecting cases).

*Inc.*, 2018 WL 418567, at *3 (collecting cases). The Tennessee statute has been summarized as follows:

> The TUTSA prohibits misappropriation of trade secrets, providing for both injunctive relief and damages. Tenn. Code Ann. §§ 47–25–1701 to 47–25–1709. "Misappropriation" means, in relevant part, either acquisition by a person who knows or has reason to know the trade secret was acquired by improper means, or disclosure without consent of a trade secret by a person who knows or has reason to know that it was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. § 47–25–1702(2). "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means." § 47–25–1702(1) . . .

> Under the plain meaning of the TUTSA, proving misappropriation requires only evidence of acquisition by improper means. *See* Tenn. Code Ann. § 47–25–1702(2). It does not require proof that the trade secret has actually been used. *See id.* Nor does the TUTSA require proof of detriment outside the misappropriation or disclosure itself. *See id.* The TUTSA indicates that harm to the owner of a trade secret is inherent in its misappropriation or disclosure. *See* § 47–25–1704 (stating that damages "can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss").

*Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 109 F. Supp. 3d 1009, 1017-18 (W.D. Tenn. 2015).[18]

_____

[18] Defendant argues that "[e]ven assuming for the sake of argument that the information in the emails qualified for trade secret protection, there is still no proof that it has been used by [Defendant], Mr. Young, VFM, or anyone else. Simply exercising control over the information is not enough to meet this burden, and Tennessee law does not recognize conversion of trade secrets." (Doc. No. 68 at 11). In support of this argument, Defendant cites to *Stratienko v. Cordis Corp.*, 429 F.3d 529, 602 (6th Cir. 2005). In that case, the Sixth Circuit noted that the four elements under Tennessee law for misappropriation of a trade secret are: "(1) the existence of a trade secret; (2) communication of the trade secret to the defendant while in a position of trust and confidence; (3) defendant's use of the communicated information; and (4) resulting detriment to the plaintiff." *Stratienko*, 429 F.3d at 600 (citing *Hickory Specialties, Inc. v. B & L Labs., Inc.*, 592 S.W.2d 583, 586 (Tenn. Ct. App.1979)). However, this case is "inapposite" to the case at hand because "*Stratienko* describes the elements of misappropriation of a trade secret under Tennessee common law—not under the TUTSA." *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 109 F. Supp. 3d 1009, 1018 (W.D. Tenn. 2015). As in *Williams-Sonoma*, Plaintiff did not plead a claim under Tennessee common law, and if it had pled a claim under Tennessee common law it would be preempted by TUTSA. *Id.*; *see also LifeLinc Anesthesia, PLLC v. Wolfe*, No. 212CV02662JPMCGC, 2012 WL

"[T]he elements for a misappropriation of trade secrets claim are: (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, No. 3:06-CV-170, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006), *aff'd*, 246 F. App'x 969 (6th Cir. 2007). The parties dispute whether any trade secrets were involved here.[19]

"TUTSA lists three requirements for information to be considered a trade secret: (1) the information must derive independent economic value from not being generally known, (2) others could obtain economic value from its disclosure or use, and (3) efforts have been made to maintain its secrecy." *J.T. Shannon Lumber Co. v. Barrett*, No. 2:07-CV-2847-JPM-CGC, 2010 WL 3069818, at *4 (W.D. Tenn. Aug. 4, 2010) (citing Tenn. Code Ann. § 47–25–1702(4)); *see also Williams-Sonoma Direct, Inc.*, 109 F. Supp. 3d at 1017 (quoting *J.T. Shannon Lumber*).[20]

---

13026748, at *2 (W.D. Tenn. Nov. 1, 2012); *Vincit Enterprises, Inc. v. Zimmerman*, No. 1:06-CV-57, 2006 WL 1319515, at *7 (E.D. Tenn. May 12, 2006); *GCA Servs. Grp., Inc. v. ParCou, LLC*, No. 216CV02251SHLCGC, 2017 WL 5496564, at *5 (W.D. Tenn. Oct. 3, 2017). The Court notes that Plaintiff also attempts to rely on the incorrect standard by citing to *Wyndham Vacation Resorts, Inc. v. Timeshare Advoc. Int'l, LLC*, No. 3:10-CV-1028, 2013 WL 139204, at *4 (M.D. Tenn. Jan. 10, 2013), which did discuss a TUTSA claim, but improperly quoted the common-law standard presented in *Stratienko*. (Doc. No. 52 at 10).

[19] Defendant also argues that Plaintiff has not shown damages or a "detriment" as required by statute, and he seems to imply in Defendant's Reply that Plaintiff did not address the issue in Plaintiff's Primary Brief) and therefore waived the issue. (Doc. No. 32 at 26; Doc. No. 63 at 2). However, as discussed in connection with the amount in controversy, TUTSA specifically allows for recovery of royalties, and Plaintiff has submitted an expert report in support of its recovery of royalties. Tenn. Code Ann. § 47-25-1704(a). Therefore, the Court will focus its discussion on whether a trade secret existed and not whether detriment existed.

[20] This Court has explained some factors relevant to whether information is a trade secret under Tennessee law:

(1) the extent to which the information is known outside of the business;

In discussing the breach of contract claim, the Court has already indicated that the third requirement (efforts to maintain secrecy) weighs in favor of Plaintiff in this case, as Plaintiff required and obtained an Employee Agreement establishing that certain information should be kept secret. Also, it also appears undisputed that Plaintiff allowed only certain employees to access the information included in Defendant's emails. (Doc. No. 52 at 6). However, the parties have each presented evidence revealing a genuine dispute of material fact regarding whether the information

---

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken by the business to guard the secrecy of the information;

(4) the value of the information to the business and to its competitors;

(5) the amount of money or effort expended by the business in developing the information;

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others[.]

*Great Am. Opportunities, Inc.*, 2018 WL 418567, at *4 (quoting *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001)). These six factors originated in cases discussing the common law misappropriation of trade secrets. *E.g.*, *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001). However, they have still been found relevant by courts (including this Court) to the analysis of whether information is a trade secret under TUTSA. *E.g.*, *SDC Fin., LLC v. Bremer*, No. 3:19-CV-00525, 2019 WL 4393543, at *4 (M.D. Tenn. Sept. 13, 2019); *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, No. 3:06-CV-170, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006), *aff'd*, 246 F. App'x 969 (6th Cir. 2007); *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 961 (M.D. Tenn. 2011). However, cases noting the distinction between TUTSA and the common law have not applied the factors (also without comment). *Williams-Sonoma Direct, Inc.*, 109 F. Supp. 3d at 1018; *J.T. Shannon Lumber Co.*, 2010 WL 3069818, at *4.

Therefore, the Court believes the appropriate analysis is to assess the three requirements prescribed by TUTSA, as enumerated in *J.T. Shannon Lumber Co.*, 2010 WL 3069818, at *4. However, the concepts and considerations reflected in the six factors certainly appear to be variously relevant to the analysis of the three requirements. Though weighing the six factors is not the appropriate test for Plaintiff's TUTSA claim, the six factors are not wholly irrelevant to the Court's analysis herein.

23

derives independent economic value from not being generally known (despite claiming that they are entitled to summary judgment due to the alleged absence of such); that is, each party presents evidence that, although not sufficient for it to obtain summary judgment, is at least sufficient to prevent the opposing party from obtaining summary judgment.[21]  Defendant notes that the technical specification sheet attached to the September 2016 email was provided by Inergy to

---

[21] Defendant has also argued that the information contained in the emails was "stale" (which Defendant indicates means the information was known in the industry, known inside PSC, was old information, and was no longer of significant value) and therefore not a trade secret. (Doc. No. 32 at 24). Defendant cites to two cases for his argument that the information in the emails was "stale." The first case stated while discussing "independent economic value" that "[c]ourts have generally held that trade secret law does not protect 'information that is merely momentary or ephemeral' because it quickly becomes stale." *Murray Energy Holdings Co. v. Bloomberg, L.P.*, No. 2:15-CV-2845, 2016 WL 3355456, at *7 (S.D. Ohio June 17, 2016) (quoting *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 1997-Ohio-75, 80 Ohio St. 3d 513, 529, 687 N.E.2d 661, 675 (1997)). In another case cited by Defendant, the Court found that

> [t]o the extent that the information plaintiff seeks to protect constitutes trade secrets, such information is only valuable for a limited period of time: strategy and marketing plans grow stale; pricing changes; and customer demands shift. Stated another way, even if [Defendant] had a duty to not disclose trade secrets independent of his Employment Agreement, any such obligation would have lapsed by the time plaintiff sought injunctive relief. Indeed, whatever value marketing materials, pricing information and even customer lists may have had in the nearer term, it is hard to imagine a scenario where they would not have become common knowledge to active competitors in the market after a full year.

*DeVere Co. v. McColley*, No. 14-CV-534-WMC, 2014 WL 6473513, at *8 (W.D. Wis. Nov. 18, 2014). Though apparently endorsing the general proposition that information in the business world does go stale, the court in *DeVere* was discussing why an *injunction* against a (former) employee's disclosure of trade secrets of the referenced type generally should be unavailable after a year has lapsed since the employee's termination by the plaintiff-employer; the court did not discuss the requirements for information to be considered a trade secret for purposes of claims (including for monetary as opposed to injunctive relief) under TUTSA (or any other state's version of the Uniform Tarde Secrets Act, for that matter). *See id.* Though "staleness" per se is not dispositive as to whether information constitutes a trade secret under TUTSA, the Court does look at whether others could obtain economic value from the information's disclosure or use (under the second requirement), and whether the information is stale seems relevant to that analysis. However, the potential staleness of the information does not prevent the existence of a genuine dispute of material fact regarding whether a trade secret is at issue in this case.

24

Plaintiff, indicating that it was clearly generally known to some extent and not kept confidential. (Doc. No. 32 at 23-24). Plaintiff responds that Defendant received this information (and any information contained in the emails, presumably) only by virtue of being a senior and longtime employee and that he was contractually obligated not to disclose the information. (Doc. No. 52 at 11, 14). Further, the Inergy document was protected by a non-disclosure agreement and was provided to Plaintiff only because it earned "qualified bidder" status (which took approximately three years), indicating that the document was not generally known outside of the business and was subject to efforts to keep the information confidential. (*Id.*). Defendant responds that the non-disclosure agreement did not apply to the Inergy document and that Plaintiff was not a qualified bidder at the time of the bid. (Doc. No. 68 at 5-6). Therefore, there is a genuine dispute of material fact as to whether the Inergy bid information was confidential information.[22]

Because of the existence of a genuine dispute of material fact regarding whether the information contained in the emails constitutes confidential information, the Court finds that it cannot grant summary judgment to either Plaintiff or Defendant on the TUTSA/DTSA claim. *See e.g.*, *J.T. Shannon Lumber Co.*, 2010 WL 3069818, at *5 ("As the parties have a material dispute

---

[22] Defendant also claims that customer contact information was "generally available" from several sources. (Doc. No. 32 at 24-25). Defendant claims that "contact information is generally available within minutes and does not take months to cultivate." (*Id.* at 26). Plaintiff responds that the customer contact information was developed through hard work, time, and resources, and therefore constitutes a trade secret. (Doc. No. 52 at 15). Because the Court has already found that it is not appropriate to grant summary judgment to either party on this claim because there is a genuine dispute of material fact regarding whether the bid information was confidential, the Court does not reach the issue of whether the contact information was confidential information, or whether any other information contained in the emails was confidential. Instead, Defendant's claim for misappropriation of trade secrets will proceed to trial, at which time the undersigned and/or the jury will address as necessary what all information (including potentially contact information as well as bid information) constitutes trade secrets.

of fact and both parties have offered evidence that that information is or is not a trade secret, the Court will deny summary judgment on this claim.").

Therefore, Defendant's Motion and Plaintiff's Motion will be denied as to Count VIII.

3. Interference with business relationships[23]

The Tennessee Supreme Court has found that a claim for intentional interference with a business relationship is an actionable tort with the following elements:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (footnotes and citation omitted).

In its Memorandum in support of its Motion, Defendant argues that he is entitled to judgment on this claim because Defendant did not help VFM develop any relationships with Plaintiff's customers and because VFM provides different services than Plaintiff provides. (Doc. No. 32 at 15-16). Plaintiff has not addressed its claim of interference with business relationships in its Plaintiff's Primary Brief (or in its reply). As Plaintiff has failed to address this claim in its Response to the Motion (Plaintiff's Primary Brief), the Court deems this claim abandoned. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's

---

[23] The Amended Complaint lists three customers with whom Defendant allegedly interfered: Nissan, Toyota, and Akebono. (Doc. No. 23 at ¶ 88). Plaintiff has since admitted that there is no evidence of attempts by Defendant to assist VFM with securing work from Akebono. (Doc. No. 54 at ¶ 24).

jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

Therefore, the Court will grant summary judgment to Defendant on Count III.

4. Fraudulent misrepresentation[24]

---

[24] The Court notes that Defendant makes several arguments regarding the pleading requirements of a fraud claim under Fed. R. Civ. P. 9(b) that are less suited to a motion for summary judgment than to a motion to dismiss under Rule 12(b)(6). In the Sixth Circuit, in order to prevail on a motion to dismiss under Rule 12(b)(6) premised solely on non-compliance with the heightened pleading standards of Rule 9(b)—as opposed to the more lenient, general standard of Rule 8—a defendant must have previously filed a motion under Rule 12(e) for a more definite statement. *See e.g.*, *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993) (establishing the rule); *Legge v. Wagner*, 7 F.3d 234 (6th Cir. 1993) ("This court has noted that in the absence of a defendant's motion for a more definite statement under Rule 12(e), dismissal on the sole basis of a plaintiff's failure to comply with Rule 9(b) is inappropriate."); *Trubiano v. Fed. Nat. Mortg.*, No. 09-11968, 2010 WL 1438979, at *2 (E.D. Mich. Apr. 9, 2010) ("[I]n the absence of Defendants' motion for a more definite statement, dismissal for failure to satisfy Rule 9(b) is not appropriate."). In discussing similar arguments made at the summary judgment stage, a district court in this circuit found that since the defendant did not previously move to dismiss on Fed. R. Civ. P. 9(b) grounds and did not previously move for a more definite statement, the court had no basis for granting summary judgment on the fraud claims, even if the arguments were procedurally allowable. *Nandor v. Gangler*, No. 1:07 CV 3374, 2009 WL 10722757, at *7 (N.D. Ohio Apr. 7, 2009) (discussing *Coffey*). The case law as a whole in unclear regarding when, if at all, a Defendant waives a 9(b) argument by failing to raise it, though the gist of the case law seems to indicate that a 9(b) argument on summary judgment is untimely. *Kallick v. U.S. Nat. Bank Ass'n*, No. CIV.A. 12-106-DLB, 2012 WL 5178152, at *4 (E.D. Ky. Oct. 18, 2012) (finding waiver for purposes of the motion when 9(b) argument not also raised on motion to dismiss under Fed. R. Civ. P. 8(a)); *Legge*, 7 F.3d at 234 (declining to decide, when considering a Rule 9(b) argument on a motion for summary judgment, whether the Rule 9(b) argument was waived by failure to address it through a proper 12(e) motion); *Milan v. Colvin*, No. CIV. 09-3666 DWF/TNL, 2011 WL 1988205, at *5 (D. Minn. May 20, 2011) (disregarding Rule 9(b) argument on summary judgment motion when not previously raised); § 1300 *Consequences of Failing to Plead Fraud or Mistake With Particularity*, 5A Fed. Prac. & Proc. Civ. § 1300 (4th ed.) (collecting cases and noting that "[d]iligence is also counseled for parties wishing to raise Rule 9(b) defects, as several courts have held that a party who fails to object to the manner in which fraud or mistake is pleaded at the pleading stage waives the specificity requirement set out in Rule 9(b).").

Here, Defendant has not previously filed a motion for a more definite statement as required in the Sixth Circuit. Therefore, the Court finds that Defendant's arguments under Rule 9(b) are improper, and it will not consider them. *Nandor*, 2009 WL 10722757, at *7. Alternatively, the Court would find that this argument has been waived, as Defendant waited until arguing his summary judgment motion to raise the issue. *See Milan*, 2011 WL 1988205, at *5; § 1300

27

"The Tennessee courts consider 'fraud,' 'intentional misrepresentation,' and 'fraudulent misrepresentation' to be different names for the same cause of action." *Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC*, 446 F. Supp. 3d 258, 275 (M.D. Tenn. 2020). The Tennessee Court of Appeals has found that:

> [A] plaintiff alleging fraudulent misrepresentation must address the following elements with particularity: 1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation.

*Raspberry v. Campbell*, No. W200601668COAR3CV, 2007 WL 2471512, at *4 (Tenn. Ct. App. Aug. 31, 2007) (quoting *McPherson v. Shea Ear Clinic*, No. W2006-01936-COA-R3-CV, 2007 WL 1237718, at *9 (Tenn. Ct. App. Jan. 18, 2007) (no perm. app. filed)).

Plaintiff points to the false expense reports to support its fraudulent misrepresentation claim, particularly instances where Defendant misrepresented his whereabouts or that he was involved in VFM business during his travel. (Doc. No. 52 at 24). In its briefing, Plaintiff includes a chart outlining various trips and the corresponding reports it asserts are fraudulent:

*Consequences of Failing to Plead Fraud or Mistake With Particularity*, 5A Fed. Prac. & Proc. Civ. § 1300 (4th ed.). Despite his misapplication of the relevant law, Defendant still points the Court to what (he purports) are undisputed facts that eliminate any genuine issue on these claims (and entitle him to judgment as a matter of law). Therefore, the Court will still discuss the claim and considers the summary judgment burden to have shifted to Plaintiff to show a genuine issue of material fact.

| Trip | False Reports of Travel |
|------|-------------------------|
| November 2010 | Misrepresented that entire trip was spent in Toluca, Mexico. Ex. 3 at PSC Johnson-888; Ex. 2 60:10-14 (admitting expense report omits any reference to Queretaro).<br>Submitted receipt for one night in Toluca hotel with location of hotel visible on receipt. Ex. 3, PSC Johnson-896.<br>Submitted obscured receipt for his stay at Casa Calderoni in Queretaro with white blank space covering location of hotel. *Id.*<br>Johnson admitted he spent that time in Queretaro with Young. Ex 2 56:25-60:25. |
| May 2011 | No disclosure of time in Queretaro, Mexico. Ex. 4, PSC Johnson-120829.<br>Admission he was in Queretaro with Young Ex 2 61:17–64:24.<br>Full receipt for hotel stay in Toluca. Ex. 4 at PSC Johnson-120835. |
| May 2013 | Full receipt for one night spent in Toluca hotel. Ex. 6, PSC Johnson-48.<br>Obscured receipt for time in Queretaro—name and location of hotel cut off *Id.* at PSC Johnson-52; Ex. 2 71:21–73:18. |
| June 2014 | Incorrectly reporting merely flying out of Queretaro, and otherwise being in either Leon or Aguascalientes ("AGU"), Mexico. Ex. 7, PSC Johnson-114.<br>Full receipt for one-night stay at Marriot in Aguascalientes. *Id.* at PSC Johnson-120.<br>Obscured receipt with white blank space covering up name and location of hotel near Queretaro Johnson stayed at starting the day after he arrived in Mexico, admitting he was with Young. *Id.* at PSC Johnson-119; Ex. 2 85:13–89:18. |
| November 2014 | Full receipt for hotel in Toluca. Ex. 7, PSC Johnson-95.<br>Obscured receipt with white blank space covering name and location of Queretaro hotel. *Id.* at PSC Johnson-98; Ex. 2 90:11–95:9. |
| July 2015 | Full receipt for stay in Marriott in Aguascalientes. Ex. 8, PSC Johnson-192.<br>Obscured receipt cutting off name and location of hotel in Queretaro. *Id.* at PSC Johnson-193; Ex. 2 104:7–106:23. |

(Doc. No. 52 at 21-22). Plaintiff apparently asserts that it was damaged by these misrepresentations because it paid expenses that it otherwise would not have paid to Defendant. (*Id.* at 5).

Defendant argues that he was not involved in VFM business or working for VFM,[25] his

---

[25] Whether or not Defendant worked for or was an employee of VFM, though arguably relevant for purposes of Fed. R. Evid. 401, is far from dispositive. Indeed, even if Defendant could remove all doubt on this issue, the (supposed) fact that he did not work for and was not employed by VFM would not be material for purposes of summary judgment, because his working for/employment by VFM is not an element of any of Plaintiff's claims; each of Plaintiff's claims could be

travel arrangements were known and accepted by PSC as shown by several declarations,[26] and he did not submit false expense reports as his travel was entirely for PSC business as shown by Defendant's testimony and the expense reports themselves. (Doc. No. 32 at 18-21). Though not specifically addressing the elements of a fraudulent misrepresentation claim in Tennessee,[27] this argument seems to be aimed at arguing that Plaintiff cannot show the first element of a fraudulent misrepresentation claim, that the representations were false (*i.e.*, that he did not submit false expense reports). Therefore, the Court finds that the burden shifted to Plaintiff on this first element.

As noted, Defendant asserts that PSC management was aware of and approved of his behavior in Mexico. (Doc. No. 32 at 21). Plaintiff rebuts this claim by noting that the approval of Defendant's expense reports would have been done by Young, and higher-level managers who

---

established irrespective of this (supposed) fact. Thus, at this stage, the Court disregards Defendant's repeated assertion that he did not work for VFM in any capacity.

[26] In connection with this assertion, Defendant makes a vague reference to Plaintiff being estopped from now arguing that the expense reports are fraudulent. (Doc. No. 32 at 21). The Court does not believe that Defendant has sufficiently made an estoppel argument with this passing reference, and the Court considers Defendant to have waived the estoppel argument for purposes of summary judgment. *See e.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation omitted)); *Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012) ("[E]ven if had they raised their argument at the appropriate time, we would find it waived on grounds that it is 'adverted to . . in a perfunctory manner, unaccompanied by some effort at developed argumentation.'") (quoting *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir.2007)); *Bowman v. Comm'r of Soc. Sec.*, No. 1:11-CV-865, 2012 WL 4343755, at *4 (W.D. Mich. Sept. 21, 2012) ("Issues raised in a perfunctory manner are deemed waived."); *Hunt v. Big Lots Stores, Inc.*, 244 F.R.D. 394, 397 (N.D. Ohio 2007) (waiving issue for purposes of summary judgment when it was raised only in the reply brief, and not in the motion for summary judgment).

[27] The Court notes that Defendant conflated his argument(s) regarding fraudulent misrepresentation, conversion, and unjust enrichment. As noted below, Defendant barely addresses the claims of conversion and unjust enrichment. This conflation makes it difficult to discern Defendant's precise arguments relating to fraudulent misrepresentation.

would have relied on Young's approval. (Doc. No. 52 at 24). Defendant also claims that he would submit (apparently in accordance with normal company accounting procedures) original receipts showing a lodging address in Queretaro together with credit card statements to Plaintiff, indicating that he was not hiding his whereabouts from PSC. (Doc. No. 32 at 20). Plaintiff states that expense reports were submitted at a different time than the credit card statements (after Defendant would have been reimbursed) and that the credit card statements were submitted to accounting personnel only to match receipts with statement charges (rather than, for example, to see whether statement charges can be squared with the expense reports). (Doc. No. 52 at 24-25). Plaintiff argues that since Defendant would have known the reporting system operated this way, he could have used the system to hide his actions by submitting the correct receipts to accounting only after he was reimbursed. (*Id.*). Additionally, as discussed above, Plaintiff has presented undisputed evidence that Defendant went with Young to visit the future VFM facility while on a business trip for Plaintiff. (Doc. No. 52 at 5). Plaintiff and Defendant also do not dispute that the expense reports contain errors (though Defendant casts these as unintentional errors and Plaintiff casts them as intentional). (Doc. No. 64 at ¶ 1).

As noted, Defendant shifted the burden to Plaintiff on the first element of a fraudulent misrepresentation claim, and Plaintiff has shown that there is a genuine dispute of material fact as to whether false statements were made. Therefore, the Court finds that there is a genuine issue of material fact regarding Plaintiff's fraudulent misrepresentation claim (Count V). The Court will deny summary judgment to Defendant on Count V.

5. Fraudulent concealment

The Sixth Circuit has noted:

As the Tennessee Supreme Court explained, "[t]he tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition

31

fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Chrisman v. Hill Home Dev., Inc.* 978 S.W.2d 535, 538–39 (Tenn.1998) (citing *Simmons v. Evans*, 185 Tenn. 282, 206 S.W.2d 295, 296 (1947)). The duty to disclose arises in three distinct circumstances: (1) "[w]here there is a previous definite fiduciary relation between the parties," (2) "[w]here it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other," and (3) "[w]here the contract or transaction is intrinsically fiduciary and calls for perfect good faith." *Domestic Sewing Mach. Co. v. Jackson*, 83 Tenn. 418, 425 (1885).

*Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003); *see also Smith v. Pfizer Inc.*, 688 F. Supp. 2d 735, 752 (M.D. Tenn. 2010). "The fact or condition must be a material fact affecting the essence of the subject matter of the contract." *Odom v. Oliver*, 310 S.W.3d 344, 349 (Tenn. Ct. App. 2009). The Tennessee Court of Appeals explained that:

> a fact is material if
>
> > (a) a reasonable [person] would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question; or
> >
> > (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his [or her] choice of action, although a reasonable [person] would not so regard it.

*Patel v. Bayliff*, 121 S.W.3d 347, 353 (Tenn.Ct.App.2003) (quoting *Lowe v. Gulf Coast Dev., Inc.*, No. 01A01–9010–CH–00374, 1991 WL 220576, at *8 (Tenn. Ct. App. 1991)). Although contracting parties have a duty to disclose material facts affecting the essence of a contract's subject matter, a party does not have a duty to disclose a material fact where ordinary diligence would have revealed the undisclosed fact. *Simmons*, 206 S.W.2d at 296; *Lonning*, 725 S.W.2d at 684. "A party cannot be permitted to claim that he has been taken advantage of if he had the means of acquiring the needed information or if, because of his business experience or his prior dealings with the other party, he should have acquired further information before he acted." M*acon County Livestock Mkt., Inc. v. Kentucky State Bank, Inc.*, 724 S.W.2d 343, 351 (Tenn. Ct. App.1986). In addition, a plaintiff's damages must have been caused by his reasonable reliance on the nondisclosure, *i.e.*, the plaintiff was not aware of the material fact and would have acted differently if the plaintiff knew of the concealed or suppressed fact. *See Simmons*, 206 S.W.2d at 297; *Body Invest, LLC v. Cone Solvents, Inc.*, No. M2006–01723–COA–R3–CV, 2007 WL 2198230, at *6 (Tenn. Ct. App. 2007) (no perm. app. filed).

*Id.* at 349-50.

Though a bit unclear, the alleged omissions at issue appear to involve Defendant not informing Plaintiff of VFM's existence and of Young's involvement with VFM. (Doc. No. 23 at 18-19). Plaintiff appears to assert that Defendant should have disclosed these circumstances (which, undisputedly, he did not). Though Defendant's argument that there was no contract between the parties has been discussed above (and rejected insofar as the Court has found that the Employee Agreement constitutes a contract), Defendant has argued that none of the three above-referenced sets of circumstances existed so as to raise a duty to disclose. That is, Defendant argues that there was no duty to disclose because there was no enforceable contract, clear fiduciary relationship, or express confidential relationship, and that Defendant had no reason to believe that VFM would harm PSC. (Doc. No. 32 at 16-17). Defendant's arguments of this nature suffice to shift the burden to Plaintiff for purposes of summary judgment on the issue of whether there was a duty to disclose. Defendant additionally argues that Plaintiff cannot show that it relied on any concealment by Defendant or that Plaintiff suffered damages, and so Defendant has shifted the burden to Plaintiff for purposes of summary judgment on these material factual issues also. (*Id.* at 18).

Plaintiff did not argue that any of the three categories of circumstances discussed are present in this case.[28] Because the Court has found the Employee Agreement to constitute a

---

[28] Plaintiff's entire argument regarding the fraudulent concealment consists of:

> To prevail on its fraudulent concealment claim, [Plaintiff] will demonstrate that (i) [Defendant] had a duty to disclose accurate facts and conditions concerning his travel on [Plaintiff's] dime, (ii) that [Defendant] failed to do so, (iii) that [Plaintiff] reasonably relied on the resulting misrepresentation, and (iv) [Plaintiff] suffered an injury as a result. *Smith v. Pfizer Inc.*, 688 F. Supp. 2d 735, 752 (M.D. Tenn. 2010).

contract, it seems that the most likely category implicated in this case would be the second category—*i.e.*, that in the Employee Agreement Plaintiff expressly reposes trust and confidence in Defendant—but Plaintiff has made no argument in its Response (the Primary Brief) that the broad language[29] included in the Employee Agreement thus created a duty to disclose. Therefore, Plaintiff has failed to show a genuine dispute of material fact on a required element of the fraudulent concealment claim.[30]

Therefore, the Court will grant summary judgment to Defendant on this claim (Count IV).

6. Breach of fiduciary duty[31]

(Doc. No. 52 at 23). Plaintiff then proceeds to focus its discussion on fraudulent misrepresentations (instead of omissions) that Defendant made.

[29] The Employee Agreement seemingly would have made such an argument colorable, inasmuch as it provided that: "Employee . . . will faithfully and diligently endeavor to further the best interests of Company during the period of said employment . . ." (Doc. No. 33-5 at 2). This kind of language arguably (though not necessarily) suggests that Plaintiff reposed "trust and confidence" in Defendant. But Plaintiff never made this argument, and the Court will not make it for Plaintiff.

[30] As a result, the Court does not need to reach the issues of whether Plaintiff showed the existence of a genuine dispute of material fact on the issues of reliance and damages.

[31] Plaintiff agrees that it cannot base its claim of breach of fiduciary duty on the misappropriation of trade secrets, as this cause of action would be preempted by TUTSA. (Doc. No. 52 at 28 n.10); *see also ProductiveMD, LLC*, 821 F. Supp. 2d at 964. However, "Plaintiff's breach of fiduciary duty claim may survive TUTSA preemption if it is supported by facts distinct from those supporting its trade secret misappropriation claim." *J.T. Shannon Lumber Co.*, No. 2010 WL 3069818, at *11. Despite agreeing that the facts supporting its claim of misappropriation of trade secrets (namely, the sending to Young of the above-discussed email) could not also support its breach of fiduciary loyalty claim, Plaintiff incongruously proceeded to use these facts to a substantial extent in arguing that Defendant was not entitled to summary judgment on the breach of fiduciary duty claim, calling these facts "part of the total mix of facts." (Doc. No. 52 at 28 n.10). The Court will decline Plaintiff's imprudent invitation to consider these facts when evaluating Plaintiff's claim, as such consideration would essentially render the claim preempted by TUTSA.

"Courts in this district have previously held that under Tennessee law, a breach of fiduciary duty claim can be brought only against a business entities' officers and directors, as opposed to mere employees." *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 844 (M.D. Tenn. 2019) (collecting cases). However, this Court has not hesitated to construe a fiduciary duty claim as a claim for a breach of the duty of loyalty. *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 964 (M.D. Tenn. 2011). "[A]ll employees owe their employer a duty of loyalty, regardless of whether they are at-will employees or have employment contracts[.]" *Ram Tool & Supply Co., Inc. v. HD Supply Constr. Supply Ltd.*, No. M201302264COAR3CV, 2016 WL 4008718, at *5 (Tenn. Ct. App. July 21, 2016). This duty requires an employee to "act solely for the benefit of the employer in matters within the scope of his employment. The employee must not engage in conduct that is adverse to the employer's interests." *Efird v. Clinic of Plastic & Reconstructive Surgery, P.A.,* 147 S.W.3d 208, 219 (Tenn. Ct. App. 2003) (citation omitted).

Plaintiff seems to have intended to bring a claim for breach of the duty of loyalty here. In the Amended Complaint, Plaintiff alleges that Defendant "was subject to fiduciary loyalty obligations, contractual confidentiality obligations, and very clear no-conflict provisions in [Plaintiff's] handbook." (Doc. No. 23 at ¶ 9). Therefore, the Court finds that it is appropriate to construe Plaintiff's claim as a claim for breach of the duty of loyalty (instead of fiduciary duty, which is undeniably something different). As every employee has a duty of loyalty to their employer in Tennessee, Defendant has failed to show the Court a reason that this claim should not instead be construed as one for breach of duty of loyalty.[32] *See Ram Tool & Supply Co., Inc.*, 2016 WL 4008718, at *5.

---

[32] Additionally, as Plaintiff notes, it appears that Defendant indicated at his deposition that he believed he owed a duty of loyalty to Plaintiff. (Doc. No. 52 at 27).

Defendant argues that there is no breach of the duty of loyalty here, because (according to him) he did not act in a way adverse to the employer's interests given that (again, according to him): 1) he worked loyally for Plaintiff for many years, 2) Defendant's actions did not harm Plaintiff, 3) VFM's formation was not a secret, and VFM it did not compete with Plaintiff (so there was no breach of loyalty by failing to inform Plaintiff of VFM's existence), 4) Defendant did not interfere with Plaintiff's customer relationships, and 5) Defendant did not engage in VFM business while traveling for Plaintiff. (Doc. No. 32 at 12-14). Defendant argues that "[f]or 45-years [Defendant] was a salesman for [Plaintiff], generating tens of millions of dollars per year in sales revenue. At no time did [Defendant] help Young develop VFM's business, especially in competition with [Plaintiff]. Further, the facts do not show a violation of any duty [Defendant] owed to [Plaintiff]. There is no proof that VFM or Young have financially harmed [Plaintiff's] business. This claim must fail." (*Id.* at 12). The Court has already found that the Employee Agreement constituted a contract between Plaintiff and Defendant. Plaintiff additionally points to the same evidence discussed above in connection with Plaintiff's fraudulent misrepresentation claim to support its breach of loyalty claim. (Doc. No. 52 at 26-27). The Court has previously noted the multiple genuine issues of material fact that exist on the fraudulent misrepresentation claim, and it finds that the same (genuine) issues apply to determining whether Defendant breached his duty of loyalty to Plaintiff.

Therefore, the Court will deny summary judgment to Defendant on this claim.

7. Conversion

According to the Tennessee Court of Appeals:

> Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights. *Barger v. Webb*, 216 Tenn. 275, 391 S.W.2d 664, 665 (1965); *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W.2d

36

207, 211 (Tenn.Ct.App.1988). Conversion is an intentional tort, and a party seeking to make out a *prima facie* case of conversion must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *Kinnard v. Shoney's, Inc.*, 100 F. Supp. 2d 781, 797 (M.D.Tenn.2000); *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn.Ct.App.1977). Property may be converted in three ways. First, a person may personally dispossess another of tangible personalty. Restatement (Second) of Torts § 223(a) (1965). Second, a person may dispossess another of tangible property through the active use of an agent. *See, e.g.*, *McCall v. Owens*, 820 S.W.2d 748, 751 (Tenn.Ct.App.1991). Third, under certain circumstances, a person who played no direct part in dispossessing another of property, may nevertheless be liable for conversion for "receiving a chattel." Restatement (Second) of Torts § 223(d).

As noted in 90 C.J.S. Trover and Conversion § 16 (2012):

Although there is authority to the contrary, the general rule is that money is an intangible and therefore not subject to a claim for conversion. However, there is an exception where the money is specific and capable of identification or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose. Identifiable funds are deemed a chattel for purposes of conversion, and conversion may be established where a party shows ownership or the right to possess specific, identifiable money. Trover will lie whenever the plaintiff's money has come into the defendant's possession and has been converted without the plaintiff's express or implied assent that the relation of debtor and creditor should arise. For money to be a subject of conversion, it need not be specifically earmarked. Moreover, specific coins or bills need not be identified, nor is it necessary to identify the specific dollars and coins represented by the face value of checks and other negotiable instruments. Conversion of checks is actionable because checks designate specific amounts of money for use for specific purposes.

Trover lies for the conversion of determinate sums, such as tax receipts or insurance premiums, where there is an obligation to keep the money intact or to deliver it. There can be, however, no conversion of money unless there was an obligation on the part of the defendant to deliver specific money to the plaintiff or unless the money was wrongfully received by the defendant. Trover does not lie to enforce a mere obligation to pay money or for money had and received for payment of a debt. On the other hand, where the defendant is under an obligation to deliver specific money to the plaintiff and fails or refuses to do so, or when wrongful possession of it has been obtained by the defendant, there is a conversion for which trover lies. Misappropriated funds placed in the custody of

37

> another for a definite purpose may be subject to a suit for
> conversion.

*Id.* (footnotes omitted).

*PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553–54 (Tenn. Ct. App. 2012); *see also Raley v. Brinkman*, No. M201802022COAR3CV, 2020 WL 4360052, at **1, 4, 18 (Tenn. Ct. App. July 30, 2020), *appeal denied* (Jan. 13, 2021) (upholding trial court finding conversion when individual underpaid distributions, underpaid salary, and there were a multitude of unexplained expenses which appeared to be personal or for another business).

Defendant does not fulsomely brief Plaintiff's conversion claim. Instead, he merely states that "Plaintiff's far-fetched speculation that he [Defendant] was doing work for VFM is not enough to support a claim for conversion or unjust enrichment." (Doc. No. 32 at 21). Beyond that, Defendant does nothing except include in a footnote the legal definition of conversion in Tennessee. (*Id.* at n. 12). To discharge his initial burden as the summary-judgment movant, Defendant must do more than assert conclusorily that it is mere far-fetched speculation that he worked for VFM.[33] What Defendant is really doing here (viewed in the light most favorable to him and considering how Rule 56 phrases what he needs to accomplish as the summary-judgment movant) is asserting that Plaintiff cannot raise a genuine issue of material fact as to whether Defendant worked for VFM—*i.e.*, asserting that Defendant cannot genuinely dispute that he did not work for VFM. In "asserting that [the] fact [that he did not work for VFM] cannot be . . . genuinely disputed," he "must support the assertion by: (A) citing to particular parts of materials

---

[33] Even if it had been presented in non-conclusory fashion, the implication that Defendant did not work for VFM (even if true) is of only limited relevance to, and certainly not dispositive of, any of Plaintiff's claims, none of which actually require that Defendant worked for VFM.

in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[34] Fed. R. Civ. P. 56(c)(1)(A)-(B). Defendant has not done so, and thus has not successfully supported the assertion on which he is relying here. Put differently, and stepping back somewhat from the tortuous and partially misstated language of Rule 56(c)(1), Defendant has failed to support, with citation to the record, his assertion that Plaintiff cannot establish a fact Defendant claims (incorrectly) that Plaintiff needs to establish to prevail on this particular claim, *i.e.,* that Defendant worked for VFM.

Therefore, the Court finds that Defendant has not carried his initial burden on a summary judgment motion of showing the absence of a genuine issue of material fact; therefore, the burden of showing that there is a genuine issue for trial has not shifted to Plaintiff. *Pittman*, 901 F.3d at 627-28.

Accordingly, the Court will deny Defendant's Motion with respect to Plaintiff's conversion claim (Count VI).

8. Unjust enrichment

"A claim for unjust enrichment must allege (1) that a benefit was conferred on the defendant; (2) the defendant appreciated the benefit; and (3) it would be unjust for the defendant

---

[34] The Court is constrained to note, without pausing to discuss in detail, that the reference at the end of this sentence to "the fact" actually should be to "the absence of the fact" where, as here, the summary judgment movant is (in the words of this portion of Rule 56) asserting that the existence of the fact "cannot be genuinely disputed"— in which case the goal of the "adverse party" would be to produce evidence to support *absence* of the fact rather than "[the existence of] the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).

to retain the benefit without providing compensation." *Great Am. Opportunities, Inc.*, 2019 WL 632670, at \*10; *see also Kalos, LLC v. White House Vill., LLC*, No. 3:20-CV-00812, 2020 WL 7027502, at \*4 (M.D. Tenn. Nov. 30, 2020), *reconsideration denied sub nom. Kalos, LLC v. White House Village, LLC, et al.*, No. 3:20-CV-00812, 2021 WL 1022752 (M.D. Tenn. Mar. 17, 2021). "As a matter of law, an unjust enrichment claim can be maintained only if an actual [contract], a contract implied in fact, does not exist between the parties." *Id.*

Plaintiff claims that it is entitled to relief on its unjust enrichment claim because: "[Plaintiff] paid [Defendant] thousands of dollars in travel expense reimbursements to which [Defendant] was not entitled, and it would be unjust to permit [Defendant] to retain that benefit. [Defendant's] insistence that expenses incurred on his multiday trips to Queretaro were for [Plaintiff's] business is not credible." (Doc. No. 52 at 26). Defendant argues that he never worked for VFM, and, as with his conversion claim, does not fulsomely brief this issue. (Doc. No. 32 at 21). Plaintiff bases the unjust enrichment claim on Defendant's expense reports, but also asserts that Defendant violated a contract between the parties by submitting these same expense reports. (Doc. No. 52 at 5) ("[Defendant] was contractually obligated to submit expense reports for these trips fully and accurately documenting his time spent and purposes for traveling, and justifying his expenses on the trip."), 20 ("Based on those expense reports, [Defendant] was repeatedly compensated in salary for his time and reimbursed for expenses unrelated to any PSC business. This activity constituted breach of contract, fraud, conversion, and unjust enrichment."), 22 ("[Plaintiff] compensated and reimbursed [Defendant] based on these reports, and there remain genuine issues of material fact as to whether [Defendant's] submission of these reports constitutes breach of contract, fraud, conversion, and unjust enrichment.").

Strangely, neither party addresses how Plaintiff's claim for unjust enrichment can exist simultaneously with its claim for breach of contract.[35] As noted, an unjust enrichment claim cannot be maintained if there is a contract between the parties that governs the subject matter of the litigation.[36] *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 469, 487 (6th Cir. 2014) (noting that

---

[35] To the extent that the Court is relying *sua sponte* on its own rationale, the Court perceives that it has the authority to do so inasmuch as it has the much greater authority to enter summary judgment *sua sponte* provided that the losing party was on notice of the need to come forward with all of its (material) evidence. *See Employers Ins. of Wausau v. Petroleum Specialties, Inc*., 69 F.3d 98, 105 (6th Cir. 1995).

[36] The Court has previously noted that unjust enrichment can be brought as an alternative claim, such as when a plaintiff also alleges that the contract underlying its breach of contract claim is void or unenforceable. *Kalos, LLC*, 2020 WL 7027502, at *4 ("Because Plaintiff admits in its Complaint that it had a valid contract, Plaintiff cannot recover under an unjust enrichment theory from the party or parties with whom it had a contract. But in order to alternatively plead these two claims, a plaintiff must plead, alternatively to the contract being valid, the contract was invalid or unenforceable; otherwise, the plaintiff has not adequately plead the two elements of unjust enrichment." (internal citation omitted) (collecting cases)). That is to say, a plaintiff can alternatively plead a claim for breach of contract and for unjust enrichment; the plaintiff can allege that there was a valid contract that was breached and, alternatively assuming that there was no contract (or at least no *enforceable* contract), that there was unjust enrichment. But at the summary judgment stage, a court forecloses the latter alternative if, as here, it finds that there in fact *was* a valid contract. Here, Plaintiff did not bring its unjust enrichment claim in the alternative, and in order to prevail on its breach of contract claim, Plaintiff argues adamantly that both the Employee Agreement and Employee Handbook are contracts—contracts breached by Defendant. In the Amended Complaint, Plaintiff bases his breach of contract claim in part on the same alleged facts as his claim for misappropriation of trade secrets and in part on the same alleged facts supporting his other (non-statutory) tort claims. And in Plaintiff's Primary Brief, Plaintiff includes not only a section (which Plaintiff elsewhere calls "Part III.B") asserting that the alleged misappropriation of trade secrets constitutes a breach of contract as well as a violation of TUTSA (and the DTSA), (Doc. No. 52 at 16-20), but also a section asserting that the same alleged conduct supporting Plaintiff's non-statutory tort claims (submission of false expense reports, etc.) also supports the breach of contract claim. In this later section addressing breach of contract, Plaintiff asserts that the language of the two alleged contracts (the Employee Handbook and Employee Agreement) support its other claims, including claims seeking to recover the same things Plaintiff seeks to recover via its unjust enrichment claim. (*Id,* at 20-23). In this later section, Plaintiff argues (unsuccessfully) that Defendant's violation of the Employee Handbook (which the Court previously determined not to be a contract) constituted a breach of contract based on Defendant's alleged conduct comprising the non-statutory torts, (*Id.* at 20-22), but also cites the earlier section (Part III.B) wherein Plaintiff asserted that Defendant breached both alleged contracts based on the

41

plaintiff could not recover when the relationship was governed by an employment agreement); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 702 (M.D. Tenn. 2018) (granting summary judgment and noting that "there is no contractual void that a quasi-contractual remedy such as unjust enrichment may fill").

Plaintiff has adamantly argued that two contracts exist in this case, bringing a count for breach of contract and attaching to the original Complaint a copy of the two alleged contracts. (Doc. Nos. 1, 1-2, 1-3, 23). Additionally, the Court has previously explained that it finds a contract existed between Defendant and Plaintiff in the form of the Employee Agreement and granted summary judgment (as to liability) to Plaintiff on the breach of contract claim. Because there was a valid contract between the parties (which Plaintiff itself argues, successfully), Plaintiff cannot also maintain an unjust enrichment claim, and the Court will grant summary judgment to Defendant on this claim. *E.g.*, *Sigmon v. Appalachian Coal Properties*, Inc., 400 F. App'x 43, 50 (6th Cir. 2010) (affirming summary judgment of unjust enrichment claim when plaintiff conceded a valid contract existed between the parties); *Hastings Mut. Ins. Co. v. Mengel Dairy Farms, LLC*, 461 F. Supp. 3d 655, 666 (N.D. Ohio 2020) ("Because the parties' dispute is governed by the contract, [defendant-counterclaimant's] unjust enrichment claim fails as a matter of law.").

Therefore, the Court will grant summary judgment to Defendant on Plaintiff's unjust enrichment claim (Count VII).

<u>**CONCLUSION**</u>

For the reasons discussed above, Defendant's Motion will be granted as to Counts III (interference with business relationships), IV (fraudulent concealment), and VII (unjust

---

same conduct that constituted the alleged misappropriation of trade secrets in violation of TUTSA (and DTSA). (*Id.* at 23).

enrichment). Plaintiff's Motion will be granted as to Count I (breach of contract), as to liability only.

Defendant's Motion and Plaintiff's Motion each will be denied as to Count VIII (misappropriation of trade secrets under TUTSA and DTSA). Defendant's Motion will additionally be denied as to Counts II (breach of fiduciary duty), V (fraudulent misrepresentation), and VI (conversion). Therefore, this matter will proceed to trial on Counts II, V, VI, and VIII, and as to damages only with respect to Count I.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE